**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Trinia Jones, Individually and as | ) | |
| Independent Administrator of the Estate of | ) | |
| Trevon Johnson, a Minor, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 17-cv-1076 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| DuPage County Sheriff's Office, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On the night of New Year's Day 2017, DuPage County sheriff's deputy and defendant Scott Kuschell ("Kuschell") was dispatched to a residence in unincorporated Villa Park, Illinois, to respond to multiple 911 calls reporting a "domestic incident" that had escalated to a physical fight between 17-year-old Trevon Johnson ("Johnson") and his 23-year-old sister Ricquia Jones ("Ricquia"). *See* Pl.'s Resp. to Defs.' [sic] R. 56.1 Stmt. Facts & Pl.'s Stmt. Add'l Facts ("RSOF") ¶¶ 6-7, 10-12, ECF No. 71; R. Jones Dep. 6:1-4, ECF No. 78, Pl.'s Ex. C (Ricquia Jones's date of birth). As discussed below, many of the material facts surrounding what happened that night are disputed. This much is not disputed: Kuschell entered the home, Ricquia yelled to Kuschell that Johnson was upstairs and stated that she wanted him to be arrested, and Kuschell called to Johnson, who was upstairs in his grandmother's bedroom, and told him to come downstairs. *See* RSOF ¶¶ 15-16, 18, 22, 24-27, 32; Def. Kuschell's Resp. to Pl.'s R. 56.1 Stmt. Add'l Facts ("RSAF") ¶¶ 12, 16, 20, ECF No. 98. While the exact position of Kuschell's body at this point is disputed, all witnesses agree that he was standing just inside the front door at the foot of the stairs to the second floor. *See* RSOF ¶ 46, RSAF ¶ 25. As Johnson began to

descend the stairs, Kuschell fired his service weapon at Johnson five times, killing him.  RSOF ¶ 46.

Kuschell testified at his deposition in this case that he believed that Johnson was about to attack him with a knife.  *See* RSOF ¶¶ 44-46.  But it is undisputed that no knife matching the description of the weapon Kuschell later gave to the Illinois State Police was found.  RSAF ¶ 33. And three witnesses testified at depositions in this case that Johnson made no threatening gestures and was instead walking down the stairs unarmed with his hands up, palms facing forward.  *See* RSAF ¶ 20–26.

Johnson's mother, plaintiff Trinia Jones ("Trinia"), brought this suit individually and in her capacity as the independent administrator of Johnson's estate.  *See* 1st Am. Compl. ("FAC") at 1, ECF No. 21.  In count III of her amended complaint, plaintiff brings a claim under 42 U.S.C. § 1983 and the Fourth Amendment alleging that Kuschell used unreasonable and excessive force against Johnson.  Counts I, II and IV, not presently at issue, assert Illinois law claims for survival, wrongful death, and infliction of emotional distress.

For the following reasons, the court denies Kuschell's motion for summary judgment because genuine disputes of fact exist material to Kuschell's qualified immunity defense.

## I.  Summary Judgment Standard

Kuschell has filed a motion for summary judgment on plaintiff's Fourth Amendment claim, arguing that he is entitled to qualified immunity.[1]  *See* Mot. Summ. J. 2, ECF No. 62.

---

[1] In his reply, Kuschell moved to strike several paragraphs of plaintiff's Local Rule ("LR") 56.1 response, plaintiff's LR 56.1(b)(3) statement of additional facts, portions of plaintiff's response memorandum, and several of plaintiff's exhibits.  *See* ECF No. 97 at 1–8.  In its discretion, the court denies these motions to the extent defendants seek to strike portions of the LR 56.1 fact statements and responses immaterial to summary judgment.  For instance, the court does not reach the motion to strike the affidavit of Andrew Scott, Pl.'s Ex. L, ECF No. 87, because it does not rely on paragraph 35 of plaintiff's statement of additional facts.  The court also does not rely on plaintiff's responses to paragraphs 20 and 47.  The court overrules plaintiff's hearsay objections to certain paragraphs of Kuschell's fact statement *infra* note 7.  While the court by no means encourages argument in LR 56.1(a)(3) responses, the level of argument exhibited in the responses filed by both sides does not warrant striking the fact statements.  The court also

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)) (brackets omitted). The court therefore considers "all of the evidence in the record in the light most favorable to the non-moving party," and draws "all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford Health Sources, Inc.,* 982 F.3d 451, 457 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)). The substantive law governing the claim or defense on which summary judgment is sought determines whether, and which, facts are material. *Lord v. Beahm*, 952 F.3d 902, 903 (7th Cir. 2020) (citing *Andersen*, 477 U.S. at 248). Here, the substantive law of qualified immunity and Fourth Amendment law governing the use of force by police officers determines what facts are material.

## II. Qualified Immunity and Fourth Amendment Principles

Plaintiff's Fourth Amendment claim arises under 42 U.S.C. § 1983, which "guarantees 'a federal forum for claims of unconstitutional treatment at the hands of state officials.'" *Knick v.*

---

independently determines whether each paragraph of the fact statements and responses is supported by the evidentiary material cited. *See, e.g.*, *Cichon v. Exelon Generation Co., LLC,* 401 F.3d 803, 809-810 (7th Cir. 2005)*; Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 991-92 (N.D. Ill. 2017); *Midwest Operating Eng'rs v. Dredge*, 147 F. Supp. 3d 724, 731 (N.D. Ill. 2015), *aff'd sub nom. Midwest Operating Eng'rs Welfare Fund v. Cleveland Quarry*, 844 F.3d 627 (7th Cir. 2016). Moreover, plaintiff produced evidence attached to her surreply, providing a basis for authenticating the photographs she submitted as exhibits A, F, I, J, N, O, P, Q, R, and S. *See* S. Grosvenor Dep., ECF No. 112; Surreply 8, ECF No. 110. Plaintiff also represents that defendants produced these photographs. Surreply 9. As plaintiff notes, producing a paper in discovery is an implicit act of authentication. *See United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982).

*Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019). At summary judgment for a § 1983 claim, the court "focuses on '(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (quoting *Armato v. Grounds*, 766 F.3d 713, 719-20 (7th Cir. 2014)). Here, there is no dispute that Kuschell acted under color of state law in his official capacity as a DuPage County sheriff's deputy. The question therefore becomes whether a reasonable jury could award money damages against Kuschell for violating the Fourth Amendment. *See id.*

Kuschell raises the affirmative defense of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815-18 (1982); *Rose ex rel. Estate of Williams v. Cline*, 902 F.3d 643, 648 (7th Cir. 2018). Once a defendant properly raises the defense of qualified immunity, the burden shifts to the plaintiff to defeat the defense. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (citing *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010)). To determine whether qualified immunity applies, the court asks two questions: (1) whether Kuschell violated a constitutional right; and (2) whether that "right was 'clearly established' at the time of the challenged conduct." *Rose*, 902 F.3d at 648 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (brackets in original). Properly applied, the qualified immunity doctrine creates "breathing room for government officials to make reasonable but mistaken judgments about open legal questions." *Id*. at 743. Hence qualified

immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

With the qualified immunity standard in mind, the court turns to the substantive constitutional right plaintiff claims was violated here. By its terms, the Fourth Amendment protects "persons" from "unreasonable" searches and seizures. U.S. Const. amend. IV. A police officer's intentional use of deadly force constitutes a seizure for Fourth Amendment purposes. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472 (7th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989).

The Fourth Amendment reasonableness standard makes allowances for the realities police officers confront in their work: "[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. The objective inquiry thus entails consideration of the "totality of the circumstances" surrounding the incident. *Id.* (citing *Garner*, 471 U.S. at 8–9); *Marion v. City of Corydon*, 559 F.3d 700, 705 (7th Cir. 2009). "As applied to a Fourth Amendment excessive-force claim, the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013)). The Fourth Amendment reasonableness inquiry is objective in the sense that the officer's "underlying intent or motivation," good or bad, does not matter. *Graham*, 490 U.S. at 397 (citation omitted). Instead, the defendant's use of force must be evaluated from the point of view of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

### III. Analysis

Under Seventh Circuit and Supreme Court law, "it is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others." *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004) (per curiam) (brackets omitted) (quoting *Garner*, 471 U.S. at 11); *accord. Estate of Williams*, 797 F.3d at 473 (citing *Marion*, 559 F.3d at 705); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Garner*, 471 U.S. at 11-12).  Consistent with *Garner*, "[c]ourts within the Seventh Circuit have regularly granted and affirmed summary judgment on excessive force claims where the suspect threatened an officer with a weapon or where the officer reasonably believed that the suspect had a weapon."  *Roos v. Patterson*, 2013 WL 3899966, at *8 (C.D. Ill. July 29, 2013) (collecting cases).  Conversely, the Supreme Court held in *Garner*, and has since reiterated, that "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'" *Brosseau*, 543 U.S. at 197 (quoting *Garner*, 471 U.S. at 11); *see also Scott v. Harris*, 550 U.S. 372, 382-83 (2007) (distinguishing *Garner*).

Thus, "[w]hat is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force."  *Muhammed*, 316 F.3d at 683 (citing *Sherrod v. Berry*, 856 F.2d 802, 804-05 (7th Cir. 1988)).  The proper question is whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397 (quoting *Scott v. United States*, 436 U.S. 128, 137-139 (1978)).  In this sense, the officer can turn out to be wrong about the facts that appeared to justify the use of force, but if the officer's view of the facts was objectively reasonable at the time, the

Fourth Amendment deems the use of force reasonable.  *See Sherrod*, 856 F.2d at 807 ("*It is not necessary that the danger which gave rise to the belief actually existed*; it is sufficient that the person resorting to self-defense at the time involved reasonably believed in the existence of such a danger . . . .  *In forming such reasonable belief a person may act upon appearances*." (emphasis in *Sherrod*) (quoting *Davis v. Freels*, 583 F.2d 337, 341 (7th Cir. 1978))).  Therefore, evidence tending to show whether the things Kuschell claims to have observed in fact happened is material because applying the objective test requires the fact finder to determine what information he had and whether any factual mistakes he made were reasonable.  *See Graham*, 490 U.S. at 396-97.

Certain facts in the summary judgment record here do not factor into the Fourth Amendment reasonableness analysis because there is no evidence that Kuschell was aware of them.  For example, the record shows that Johnson had recently returned from a church service before he was shot, and the dispute between Johnson and Ricquia began as a spat over a can of soda pop.  RSAF ¶¶ 1, 34 (undisputed).  No party points to evidence that anyone communicated those facts to Kuschell before he fired at Johnson, *see id.,* so neither fact affects the Fourth Amendment analysis.  *See Graham,* 490 U.S. at 397; *Horton v. Pobjecky*, 883 F.3d 941, 951 (7th Cir. 2018)*.*

Plaintiff also makes a series of arguments to the effect that Johnson's death could have been avoided if Kuschell had waited for backup before going into the home and calling out to Johnson to come downstairs.  *See, e.g.,* Pl.'s Mem. Opp to Def.'s Mot. Summ. J. 4, 14, ECF No. 73; RSAF ¶¶ 14-15, 35.  It is undisputed that Kuschell was aware that other officers had been dispatched to the scene, but he did not wait for backup before he went into the home and called to Johnson to come downstairs.  RSAF ¶¶ 9, 10, 15, 35.  Plaintiff asserts that by not

waiting for backup, Kuschell violated DuPage County Sheriff's Office procedures, as well as generally accepted police procedures.  *See id.*

The Seventh Circuit has repeatedly held that police department procedures and best practices are not the *sine qua non* of the Fourth Amendment reasonableness standard.  *See, e.g., Turner v. City of Champaign*, 979 F.3d 563, 568-69 (7th Cir. 2020); *United States v. Brown*, 871 F.3d 532, 536-37 (7th Cir. 2017).  Indeed, the opinion in *Brown* holds unequivocally that "[t]he excessive-force inquiry is governed by constitutional principles, not police-department regulations," and so "a police officer's violation of departmental policy is 'completely immaterial [on] the question ... whether a violation of the federal constitution has been established.'"  *Brown*, 871 F.3d at 536-37 (citing *Scott v. Edinburg*, 346 F.3d 752, 760-61 (7th Cir. 2003), for the first quotation and *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006), for the second quotation).  Furthermore, "the availability of less severe alternatives does not necessarily render the use of deadly force unconstitutional.  The Fourth Amendment does not require 'the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under'" *Garner* and *Graham*.  *Horton*, 883 F.3d at 950.  Applying these rules, plaintiff's arguments about any alleged deviations from police procedures or best practices do not by themselves create a genuine dispute of material fact.  Binding precedent forecloses these arguments.  *See Turner*, 979 F.3d at 568.  As in *Turner*, waiting for backup may "[w]ith the benefit of hindsight . . . have saved [Johnson's] life.  But police training policies and best practices, while relevant, do not define what is reasonable under the Fourth Amendment." [2]  *Id.* (citing *Brown*, 871 F.3d at 536-37).

---

[2] Plaintiff does not argue that Kuschell's conduct prior to firing at Johnson separately violated the Fourth Amendment.  The Supreme Court held in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 & n.* (2017), that "once a use of force is deemed reasonable under *Graham*, it may not be found unreasonable by reference to some separate constitutional violation."

Having sifted out the immaterial facts, the court turns to the outcome determinative question: whether, based on the information he had at the moment he fired, Kuschell reasonably believed that Johnson posed an imminent threat of death or serious bodily injury. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-47 (2017); *Horton*, 883 F.3d at 949-50. The Seventh Circuit has *"*recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (citing *Catlin v. City of Wheaton,* 574 F.3d 361, 367 (7th Cir. 2009)); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) ("we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly").

Kuschell contends that the material facts are largely undisputed. Def.'s Mem. Supp. Mot. Summ. J. 16, ECF No. 63. He relies almost exclusively on his own deposition testimony to establish those facts. *See id.* at 11-12 (citing Def.'s LR 56.1(a)(3) Stmt. of Undisputed Material Facts ¶¶ 6, 7, 12, 14, 15, 18, 19, 24, 25, 26, 27, 28, 30, 34, 38, 40, 42, 43, 44, 45; ECF No. 64). Plaintiff counters by pointing chiefly to the deposition testimony of four of Johnson's family members, all of whom were present in the home at the time of the shooting: plaintiff Trinia Jones, Johnson's mother; Ricquia Jones, Johnson's older sister; Robert Pelts ("Pelts"), Johnson's older brother (age 25 or 26 on the date of the shooting); and Willie Bradley ("Bradley"), Johnson's grandfather. *See* RSAF ¶¶ 11–28; R. Pelts Dep. 3:19-20, ECF No. 79, Pl.'s Ex. D (Robert Pelts's age). Three of the witnesses—Trinia Jones, Ricquia Jones, and Willie Bradley—testified that they saw the shooting take place, while Robert Pelts testified that he heard the shooting. *See, e.g.,*T. Jones Dep. 53:1-16, ECF No. 82, Pl.'s Ex. G; R. Jones Dep. 60:4-61:15; W. Bradley Dep. 77:6-78:22, ECF No. 76, Pl.'s Ex. B; R. Pelts Dep. 57:12-19.

As discussed below, the witnesses' testimony creates several genuine factual questions material to what information Kuschell had been given and what he actually observed leading up to the shooting.

Beginning with undisputed facts about the information Kuschell had, dispatchers informed Kuschell that there was a possible "domestic" dispute occurring in which "a male subject, approximately six feet six inches, was threatening [other people] with a knife."[3]  RSOF ¶ 7.  One or more of the 911 callers gave Johnson's name to dispatchers who in turn relayed it to Kuschell.  *See* RSOF ¶ 16.  The witnesses agree that Kuschell eventually went inside the home.

The witnesses also agree that Bradley and Ricquia were the only two people on the first floor of the home when Kuschell entered.  *See* RSOF ¶¶ 21-22.  Ricquia "became very animated" when she saw Kuschell.  RSOF ¶ 26.  She was yelling that Johnson had hurt her and that she wanted him to be arrested.  RSOF ¶¶ 24, 26.  Ricquia showed Kuschell her head— whether there was blood is disputed—and her braid on the floor, stating that "he [Johnson] did this to me."  *See* RSOF ¶¶ 26–27.

It is also undisputed that Johnson's brother, Pelts, came downstairs at some point before Johnson.  *See* RSAF ¶ 18-19.  Pelts informed Kuschell that he was not Johnson and kept his hands on the stair railing as he descended.  *Id.* ¶¶ 17-19.  A reasonable jury could find from Pelts's testimony that Kuschell was pointing his gun up the stairs as Pelts descended them.  *See id.* ¶ 18.

---

[3] Plaintiff disagrees that the dispatcher used the term "violent domestic" as stated in Kuschell's LR 56.1(a)(3) statement of undisputed material facts.  *See* RSOF ¶ 7.  The record contains transcripts of the 911 calls placed by Trinia and Racquia on the night of the shooting.  ECF Nos. 84, 91.  The record does not contain a transcript of the audio recording of police radio traffic filed as plaintiff's exhibit A, ECF No. 87, but contains only the audio recording.  The court has listened to the recording, and the phrase "violent domestic" is not used.

Plaintiff has not created a genuine dispute as to Kuschell's testimony that there was yelling coming from the home's second story. *See* RSOF ¶¶ 20, 23, 35. Plaintiff points to Bradley's testimony that "everything had calmed down" and fighting had stopped by the time Kuschell arrived. *See id.* (citing in response W. Bradley Dep. 95:15-24, 96:1, 96:9-12. In context, however, Bradley's deposition testimony applies to the time of Kuschell's arrival; it does not preclude the possibility that the argument restarted after Kuschell's arrival. *See* W. Bradley Dep. 95:10–97:10.

A genuine dispute does exist, however, over whether Bradley and Ricquia told Kuschell that Johnson was no longer armed.[4] According to his deposition, Kuschell, at different times, asked Bradley and Ricquia similar compound questions of the form: Is Johnson upstairs, and does he have a knife?[5] *See* RSOF ¶ 19, 28. Kuschell testified that both replied, "Yes," and Bradley kept pointing upstairs. *Id.* A simple yes or no answer to a "two-pronged question [like Kuschell's] could be viewed as ambiguous." *See United States ex rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir. 1977) (per curiam). On Kuschell's version of these exchanges, a reasonable jury could find that an officer in Kuschell's position could not be reasonably certain as to whether Johnson was, or was not, armed.[6]

---

[4] Kuschell testified that he asked Pelts whether Johnson was still upstairs and armed with a knife. RSOF ¶ 40. Like Ricquia, Pelts directly contradicts Kuschell's testimony. *See* R. Pelts Dep. 49:18-50:3, 74:14-21. Furthermore, Kuschell's compound question suffers from the same ambiguity as his questions to Bradley and Ricquia.

[5] According to his deposition, Kuschell first asked Bradley whether "[h]e was Trevon." RSOF ¶ 18 (undisputed). Bradley responded that "he lived there and that he's upstairs." *Id.* Kuschell followed up, according to his deposition testimony, with a compound question: "if by 'he' he meant Trevon and did he have a knife?" *Id.* ¶ 19. Bradley replied, "yes," and continued pointing upstairs. *Id.* Kuschell testified that he similarly asked Ricquia "if Trevon was upstairs and does he have a knife?" *Id.* ¶ 28; S. Kuschell Dep. 58:18-21, ECF No. 64-2, Def.'s Ex. 2. She responded, "He's upstairs, yes," according to Kuschell. RSOF ¶ 28; S. Kuschell Dep 58:22.

[6] Plaintiff objects to paragraphs 19, 31, 37, and 40 of Kuschell's fact statement on hearsay grounds. *See* Resp. to SOF ¶ 19, 31, 37, 40. In each of these paragraphs, Kuschell cites his deposition testimony that after he entered the home, Bradley and Ricquia told him, or indicated through conduct, that Johnson was upstairs and had a knife. *See id*.

Furthermore, Ricquia's deposition testimony directly conflicts with Kuschell's on this point. Ricquia testified that Kuschell asked, "Where is he [(Johnson)]? Is he armed?" R. Jones Dep. 96:8-9. "I said, 'No, he's upstairs with my grandmother.'" *Id.* at 96:9-10. Ricquia's version of her answer specifically told Kuschell that Johnson was upstairs and unarmed.

Despite putatively being informed that Johnson was unarmed, Kuschell did not necessarily have to treat Johnson as a non-threat. Kuschell had also been shown evidence from which he could have reasonably concluded that Johnson had ripped out Ricquia's braid and broken a small glass table. "[T]he police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Horton*, 883 F.3d at 951 (citing *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009)). Nonetheless, although an "officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment. The circumstances might materially change." *Id.* (citing *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993), discussed in detail below). In the case at hand, a reasonable jury could find that, to the extent deadly force may have been an option prior to Kuschell calling for Johnson to come downstairs, the circumstances changed in two important ways.

---

The court overrules plaintiff's hearsay objections to paragraphs 19, 31, 37, and 40. "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (other citations omitted). To be hearsay, a statement made outside of court must be offered "in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). Kuschell does not use Bradley and Ricquia's alleged statements in order to prove that Johnson had a knife. Rather, these statements are used to explain Kuschell's thinking at the time and what motivated his actions, regardless of whether Johnson was in fact armed. *See* RSOF ¶¶ 19, 31, 37, 40. "A witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the witness was thinking, at the time or what motivated him to do something." *Simpson v. Beaver Dam Cmty. Hosps., Inc.,* 780 F.3d 784, 796 (7th Cir. 2015) (quoting *United States v. Leonard–Allen*, 739 F.3d 948, 954 (7th Cir. 2013)) (affirming decision to overrule hearsay objection at summary judgment; *accord United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993). Thus, so long as the statements in paragraphs 19, 31, 37, and 40 of Kuschell's fact statement are used to prove their effect on Kuschell's thinking, the rule against hearsay is not a barrier to their admission.

12

First, Pelts came downstairs before Johnson, either with his hands on the railing (his testimony) or with his hands up (Kuschell's testimony).  *See* RSAF ¶¶ 18–19; RSOF ¶¶ 35, 37-38.  The exact details of Pelts's descent are disputed.  *See* RSOF ¶ 35-38.  What matters for the objective Fourth Amendment analysis is that a reasonable jury could find that Kuschell could see Pelts well enough to determine where his hands were and that he was unarmed as he came down the stairs.  *See id.*  A jury viewing these facts favorably to plaintiff could further infer that Kuschell had an equally clear view of Johnson and his hands as he came downstairs a short time later.

Second and most importantly, a reasonable jury could find that Johnson came downstairs slowly, that he made no threatening gestures, that he had his hands up, palms facing forward, and that he had nothing in his hands that could be reasonably mistaken for a weapon.  With only modest inferences favorable to plaintiff, Trinia, Ricquia, and Bradley testified consistently on each of those points.  *See* RSAF ¶¶ 20-26 (collecting testimony; no contrary evidence cited).  A reasonable jury could also find the fact that Johnson's body was found at the top of the stairs with his head facing the top of the stairs and his feet facing Kuschell as corroborating this testimony.  RSAF ¶ 33 (undisputed).  And a jury could also view the Illinois State Police investigative report as corroborative.  Kuschell told the Illinois State Police investigators that he thought Johnson "had a 3 to 4 inch long, ½ to ¾ inch wide, dull gray, knifelike object in his hand," and that it could have been a "knife, ice pick, wood chisel, or a box cutter."[7]  *See* Illinois State Police Investigative Summary at 2, ECF No. 80, Pl.'s Ex. E.  It is undisputed that "no knife or other weapon [was] found in Trevon's possession, or anywhere near him."  RSAF ¶ 33 (undisputed); *see also* RSAF ¶ 32.

---

[7] At his deposition, Kuschell described the object as being "light gray in color" and "three to five inches long by half to slightly larger than half inch in width."  S. Kuschell Dep. 135:5-7; *see also* RSAF ¶ 30.

Kuschell told a very different story at his deposition. *See* RSOF ¶¶ 41–46. In Kuschell's deposition, he testified that he heard a loud bang upstairs followed by the sound of running feet and a "guttural growl" he compared to a person about to make a football tackle. *Id.* ¶ 42. Kuschell then saw Johnson come around the corner with an object in his hand that Kuschell believed was a knife. *See id.* ¶¶ 43-45. He fired five shots in under one second, according to his testimony. *Id.* ¶ 46.

As legions of cases teach, making "[c]redibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . [at] summary judgment." *Anderson, supra*, 477 U.S. at 255. That is, "summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citations omitted). To determine whether a trial is needed, this court must adopt the version of the facts supported by the summary judgment record that is most favorable to the party resisting summary judgment, here the plaintiff. *See id*.

On the version of the facts the court must adopt at summary judgment, Kuschell had been informed by Ricquia that Johnson was no longer armed. As with Pelts, Kuschell could see where Johnson's hands were and whether he had anything in them as he descended the stairs. *See* RSAF ¶¶ 18-19. And as a matter of objective fact, a jury could find that Kuschell saw Johnson walking slowly down the stairs, making no threatening gestures, with his empty hands up, palms facing forward. *Id.* ¶¶ 20-26. As discussed in the following paragraphs, if a jury finds these facts, Kuschell can be held liable for violating clearly established law.

Kuschell contends that the Seventh Circuit's decision in *Mason-Funk v. City of Neenah*, 895 F.3d 504 (7th Cir. 2018), is controlling. Reply 12-13, ECF No. 97. *Mason-Funk* is a "tragic" case of an officer reasonably misidentifying an escaping hostage as the hostage taker.

*See Mason-Funk,* 895 F.3d. at 505.  In *Mason-Funk*, Brian Flatoff ("Flatoff") walked into a motorcycle shop with a gun and took four people hostage, including Michael Funk ("Funk"), the person eventually misidentified by police.  *Id.* at 505-06.  Officer Sean Ross ("Ross") was part of a SWAT team that formed a perimeter around the shop.  *Id.* at 506.  He learned from dispatchers that three hostages had been taken, that the suspect had a gun, and that he was a long-haired white male wearing a plaid jacket.  *Id.*  Four officers attempted to enter the shop from the alley behind it, but Flatoff repelled them in a hail of gunfire.  *See id.*  Funk subsequently managed to escape out the shop's back door as Flatoff was shooting at him.  *See id.* at 506-07.  The officers had mere seconds to react, and they saw Funk retrieve a handgun from the waistband of his pants and run across the alley.  *See id.* at 507.  Believing Funk to be the suspect, Ross opened fire, killing Funk.  *Id.*  The Seventh Circuit pointed to the case's unique facts to hold that no clearly established law warned the officer that shooting "an armed individual, without warning in a dangerous and chaotic hostage situation, violated any clearly established right."  *Id.* at 509.

The facts as the jury could find them here are a far cry from the "distinct," violent, rapidly developing hostage situation in *Mason-Funk.*  *Id.* at 509.  The court in *Mason-Funk* distinguished several cases in which "individuals armed with guns did not pose an imminent threat to the officers based on the context of those confrontations."  *See id.*  The *Mason-Funk* court described the cases it was distinguishing as holding that it is "clearly established that deadly force could not be used when an armed individual posed no threat to the officers, made no sudden movements, and ignored no commands."  *Id.* at 509 (citing *Cooper v. Sheehan*, 735 F.3d 153, 159-60 (4th Cir. 2013)).

Contrary to Kuschell's position, the *Mason-Funk* court's description of clearly established law supports denying summary judgment here.  As already discussed, a reasonable

jury could find that Johnson was making no sudden movements, he posed no threat, and was complying with Kuschell's commands. *See* RSAF ¶¶ 20-26.

The primary case on which plaintiff relies, *Ellis v. Wynalda,* 999 F.2d 243 (7th Cir. 1993), further demonstrates that a reasonable jury could find that Kuschell violated clearly established law. In *Ellis*, the Seventh Circuit denied qualified immunity to an officer who shot a burglary suspect after the suspect had thrown a lightweight bag he was carrying to the ground and fled from the officer. 999 F.2d at 245. The Seventh Circuit noted that, as is the case with Kuschell on this summary judgment record, the officer could see the suspect and determine that he was no longer armed as he ran. *Id.* at 247. Although the officer may have had a reasonable fear that the suspect posed an imminent danger when he held the bag at the beginning of the encounter, once the suspect tossed it away and ran with no weapon, the officer's reasonable fear that the suspect posed an imminent danger dissipated, and he could not reasonably use deadly force. *Id.*

Similarly, a reasonable jury in this case could find that Kuschell's fear of imminent danger dissipated when Johnson started to come down the stairs with his hands up. Kuschell attempts to distinguish *Ellis* by asking the court to credit his version of the facts instead of plaintiff's. *See* Reply 14. But as already discussed, the facts must be viewed in the light most favorable to the plaintiff at summary judgment.

The court does not rest its qualified immunity holding on *Ellis* and *Mason-Funk* alone, however. Both cases accord with clearly established law holding that an officer cannot, consistent with the Fourth Amendment, "seize an unarmed, nondangerous suspect by shooting him dead." *Brosseau, supra,* 543 U.S. at 197 (quoting *Garner*, 471 U.S. at 11); *see Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018) (discussing "the clearly established law that the use

16

of deadly force against a person posing no risk of imminent harm is unreasonable"); *Becker v. Elfreich*, 821 F.3d 920, 929 (7th Cir. 2016) (affirming denial of qualified immunity to an officer who used excessive force against a person who held his hands above his head, stating the officer "should have recognized that [the arrestee] was not hiding in the house but was in the process of surrendering"); *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (holding on qualified immunity analysis that "*Graham* and *Garner* stand for the proposition that a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else"); *see also Abbott, supra,* 705 F.3d at 732 (it is "well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects"); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (same as to passive resistance).

## IV.  Conclusion

For the reasons stated, genuine disputes of material fact require a trial on defendant Scott Kuschell's claim of qualified immunity for violating the Fourth Amendment.  Accordingly, Kuschell's motion for summary judgment is denied.

Dated: March 29, 2021

                                                      /s/
                                            Joan B. Gottschall
                                            United States District Judge